

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

MARK A. HURT, :
:
    Plaintiff, :
:
vs. : 5:03-CV-265-4 (DF)
:
FEDERAL BUREAU OF PRISONS, et al., :
:
    Defendants. :

Civil Order File
Volume 87
Page 9065

## ORDER

Currently before the Court is Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction (tab #3) pursuant to Fed. R. Civ. P. 65 (West 2003). Plaintiff seeks an injunction from the Court ordering the Bureau of Prisons to withdraw their order, which denied Plaintiff a transfer to a halfway-house on or about August 15, 2003. In support of his motion, Plaintiff proffers three statutory and three constitutional violations that, if valid, could justify the grant of such injunction.

## I. FACTUAL BACKGROUND

On April 18, 2002, Plaintiff entered a guilty plea in this Court to two counts of bank fraud and was subsequently sentenced on September 4, 2002, to a term of eighteen months in the custody of the United States Bureau of Prisons ("BOP"). The Court did not recommend a place or type of confinement for Plaintiff. Plaintiff was incarcerated at the Federal Prison Camp ("FPC") at Edgefield, South Carolina. Upon arrival at the Edgefield FPC, Plaintiff met with his assigned case manager and learned of the possibility of serving

the final six months of his sentence in a Community Confinement Center ("CCC"), which was in agreement with the information he had earlier learned from his attorney during their consideration of the decision to enter a guilty plea. Thus Plaintiff believed that, he was to spend his final six months of incarceration in a CCC, which was to be the Dismas House Charities located in Macon, Georgia, with his transfer to the CCC taking place on or around August 15, 2003.

In December 2002, nearly two months after Plaintiff began his term in the custody of the Bureau of Prisons ("BOP") and after his initial meeting with his case manager, the BOP issued a memorandum "clarifying" pre-existing policy. The BOP memorandum was based on a December 13, 2002 Memorandum of Understanding promulgated by the Department of Justice. The Department of Justice memorandum was written in order to clarify the legal authority of the BOP to allow inmates to serve terms of incarceration in a CCC. Reasoning that a CCC is not a place of imprisonment, the Department of Justice found the BOP without legal authority to allow inmates to serve their entire sentence in a CCC or to transfer from a federal prison to a CCC an inmate with more than ten percent of their sentence remaining.

Based on the legal holding in the Department of Justice Memorandum of Understanding, the BOP issued the December 20, 2002 memorandum to federal judges and prison officials, which stated the position of the BOP in light of the clarification provided by the Department of Justice. No longer would inmates in the custody of the BOP be allowed to serve their sentence in a CCC, even with a judicial recommendation, and no inmate would be transferred to a CCC who had more than ten percent of their

sentence remaining. In addition, the Memorandum noted that this clarification of authority was to be applied prospectively with the exception that anyone currently in a CCC with 150 days or more remaining on their sentence would be transferred to a federal prison facility.

Enacted along with the Sentencing Reform Act of 1984, 18 U.S.C.A. § 3624(c) (West 2000) has provided the basis for the BOP practice of transferring and placing inmates for more than seventeen years. With this December 20, 2002 memorandum, the BOP provided a new interpretation for its policy regarding inmate placement and transfer based on what it deems to be a corrected interpretation of its legal authority to act, which comes from the statutory language of the Sentencing Guidelines when read in conjunction with 18 U.S.C.A. § 3621 (West 2000) and § 3624.

In light of the revised interpretation of the BOP's authority to transfer inmates between incarceration in a prison and incarceration in a CCC, Plaintiff is not eligible to be transferred to a CCC until seven weeks before the expiration of his term of incarceration, which would be on or around December 27, 2004. It is from this seventeen week delay, the period between August 15 and December 27, that Plaintiff seeks relief, asking this Court to order the BOP to withdraw their order denying his transfer to the Dismas House Charities, a designated CCC.[1]

---

[1] Plaintiff's basis for venue in this action is partially premised on the location of Dismas House within this District and also on BOP's operation within the District. Furthermore Plaintiff currently is incarcerated within the District. Defendant raised venue as an issue for the first time after oral argument in supplemental briefs to the Court. Venue was considered proper for Plaintiff's claim under 28 U.S.C.A. § 1391 (West 2000), as § 1391 allows for venue in a district where a substantial part of the events or omissions occurred. Plaintiff's failure to be transferred to Dismas House was the omitted act giving rise to this action.

3

## II. STANDARD FOR INJUNCTIVE RELIEF

Injunctive relief is reserved for only the most necessary of situations, as it is an extraordinary remedy. The movant, here Plaintiff, has a high threshold to cross before injunctive relief will be granted. As noted by the Eleventh Circuit, district courts may grant preliminary injunctive relief if the movant shows: (1) a substantial likelihood of success of the merits, (2) irreparable injury to the movant if the preliminary injunction is denied, (3) the threatened injury to the movant outweighs the damage the injunction would cause the non-movant, and (4) the injunction would not be adverse to the public interest. See *Fours Seasons Hotels & Resorts, B. V. v. Consorcio Barr, S.A.*, 320 F. 3d 1205, 1210 (11th Cir. 2003). In the case at hand, the dispute over the grant of an injunction between the parties centers on the first prong, showing a substantial likelihood of success on the merits. It is this prong of the test that the Court will discuss below with regard to Plaintiff's six claims, but before turning to those claims, the Court finds that Plaintiff has met the other factors for an injunction.

First, Plaintiff will suffer irreparable injury if the injunction is denied and his incarceration at Edgefield FPC continues, as his return to his business and his family obligations will be further delayed. It is Plaintiff's desire to return to his business and aid in its maintenance and advancement in order to fulfill his family, business and societal responsibilities. Second, any harm suffered by Plaintiff, if the injunction is denied, will outweigh any harm caused the Defendant, if the injunction is granted. In fact, the BOP is not likely to suffer any harm. Furthermore, the BOP may even benefit financially, administratively and logistically if Plaintiff is transferred to a CCC. Finally, this injunction

4

would not be adverse to the public interest. The public has a strong interest in the goals of the justice system, specifically, punishment, deterrence and rehabilitation. Additionally, the public has an interest in fostering and preserving family relations. For these reasons, prongs two, three and four of the test for a preliminary injunction weigh in Plaintiff's favor. The Court now turns to the Plaintiff's likelihood of success on the merits and the six arguments Plaintiff makes to show such a likelihood.

## III. STATUTORY CLAIMS

### A. Retroactive Application of Law

Courts have found the new BOP policy to constitute a retroactive application of law. See *Cutler v. United States*, 241 F. Supp. 2d 19 (D. D.C. 2003) and *Byrd v. Moore*, 252 F. Supp. 2d 293 (W.D. N.C. 2003). However, the distinguishing characteristic of the inmates granted relief in these cases is that the inmate was currently in a CCC facing transfer to prison. As stated in the BOP December 20, 2002 memorandum, the only retroactive application of the new interpretation of BOP policy is to those inmates in a CCC whose projected release date was May 15, 2003 or later. Other courts have noted the retroactive application of this policy by pointing only to those inmates presently in a CCC with more than 150 days remaining in their sentence. For example, one court has noted that,

> [t]his new interpretation is clearly retroactive to persons who are in a community confinement center with greater than a 150-day sentence. The Court need not consider the validity of this retroactive applicant because Benton is not within the class of inmates affected by retroactive application.

*Benton v. Ashcroft*, No. 03-CV-0270, 2003 WL 21739087 (S.D. Cal. July 25, 2003).

5

Thus, as Plaintiff is not in a CCC with 150 days or more remaining on his sentence facing a transfer to prison, Plaintiff is not subject to a retroactive application of this new policy.

Plaintiff offers his expectation interest and hope of pre-release on or around August 15, 2003 to support a claim of retroactive application. In other words, Plaintiff contends that but for this new interpretation of policy he would be in CCC placement. Specifically, by the BOP memorandum, prison officials are advised to immediately review future pre-release cases to ensure compliance with the new interpretation of policy. Plaintiff is just this type of inmate, a future pre-release whose file was reviewed to ensure compliance with the new procedure, resulting in a delay in transfer to a CCC. Furthermore, BOP contends that Plaintiff never had an assigned pre-release date and that any discussions occurring between Plaintiff and his lawyer or case manager were preliminary at best, thus Plaintiff possessed only a hope of transfer. Similarly, the defendant in ***United States v. Kramer***, No. 02-CR-47, 2003 WL 1964489 (N. D. Ill. April 28, 2003) argued that he had a right to have his sentence corrected as his placement in a CCC had not materialized as he expected, but that court held that an expectation or hope was not enough to overcome the reasonable imposition by BOP of a term of incarceration rather than CCC placement. As Plaintiff was not incarcerated in a CCC when the policy changed and had only an expectation interest in a transfer, there is not a retroactive application of a new policy to Plaintiff's case.

### B. *Violation of Administrative Procedure Act*

The Administrative Procedure Act ("APA") applies to all agencies of the federal government and was enacted in order to ensure fair and just agency action. To

6

accomplish this aim, the APA requires that all new or amended rules go through a specified rule making process, either formal or informal. Formal rule making is required specifically by statue, and unless specified, agencies may follow informal rulemaking which requires the agency provide the proposed rule to the public by notice and then receive comment before finalizing their action. See 5 U.S.C.A. § 553 (West 2000).

First, it is necessary to consider whether the new BOP policy regarding inmate placement in and transfer to CCCs constitutes a rule, thus invoking the APA. The APA defines the term rule broadly to include, "an agency statement of general or particular applicability and future effect designed to implement, interpret or proscribe law. . . ." Moreover, the Eleventh Circuit has ruled that an agency decision to "[r]everse a longstanding and uniform practice... is clearly a rule." *Jean v. Nelson*, 711 F. 2d 1455, 1476 (11th Cir. 1983)(internal quotations omitted).

In *Jean*, the Eleventh Circuit considered whether the decision to depart from a longstanding policy, whereby illegal aliens were not normally detained before a determination as to their admissibility, in favor of a new plan, which required immigration officials to detain nearly all undocumented aliens, was a rule and if so whether the failure to follow notice and comment in formulating this rule violated the APA. See *id.* The Court reasoned that by creating a rule of general applicability which limited the discretion of the immigration service to act in individual cases, the government had put itself within the realm of notice and comment rule making under the APA. See *id.* Furthermore, the Court went on to clarify

7

that this new policy was more than an "explanation" or "clarification" of an existing rule or policy as it stated a new course of action. *Id.* at 1481.²

With this precedent for the definition of agency rule making, it seems clear that the new BOP policy would qualify as a rule subject to the requirements of notice and comment. This new policy jettisons a seventeen-year history of allowing inmates to serve greater than ten percent of their sentence in a CCC. The policy also enacts a strict compliance requirement in every case taking away any individual case-by-case discretion. Furthermore, the policy both puts forth a new interpretation of an existing statue and serves to alter the landscape by charting a new course of action. This new policy cannot be merely a new interpretation of BOP policy because it so drastically alters longstanding policy and gives the agency a new mandate for its decisions. To rule otherwise would be in direct conflict with what the *Jean* court determined constituted agency rule making. Earlier this year in *McDonald v. Federal Bureau of Prisons*, No. 1:03-CV-235 (N.D. Ga. Feb.14, 2003), the Northern District of Georgia applied the *Jean* rationale and also determined, for the same reasons, that the new BOP policy in question was subject to notice and comment as required by the APA.³

---

² Although the Eleventh Circuit granted a hearing en banc and vacated the panel opinion, *see Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc), at which time the APA issues had become moot, other courts have continued to follow the APA principles outlined in *Jean*.

³ Most recently in *Monahan v. Winn*, No. CIV. 03-40075-NG, CIV. 03-10308-NG, CRIM.01-10385-NG, CIV.03-40139-NG, 2003 WL 21940908 (D.Mass. August 12, 2003), the claims of the BOP that this new policy was merely an interpretation of an existing policy were rejected and the APA notice and comment procedures were found violated, and thus the policy declared invalid.

Second, having decided that the new policy constitutes a rule subject to the notice and comment procedure required by the APA, the Court must determine the effect of violating such requirement. However, following the finding that a rule violates the APA, the Supreme Court has held that the rule resulting from such violation is invalid. See *Auer v. Robbins*, 519 U.S. 452 at 459 (1997). Accordingly, the Court finds the new BOP policy invalid.[4] See also *Estes v. Federal Bureau of Prisons*, No. CIV. A. 03-0070-CB-L, 2003 WL 21730541 (S.D.Al. July 24, 2003),

## C. Substance of New Rule Contrary to Law

Because this Court holds that the new BOP policy violates the APA as notice and comment were not provided for, this new policy is invalid. An invalid policy need not be considered as either contrary to or in agreement with law, as that would be nothing more than a theoretical discussion of law, in which this Court will not participate. However, it is necessary to consider Plaintiff's constitutional claims as a constitutional violation may exist regardless of the validity of BOP policy.

---

[4] A survey of district courts considering the claims of inmates that this new BOP policy violates the APA finds that eight courts have declared the policy invalid and one court has held the policy interpretative and thus not subject to the APA notice and comment requirements. However, that court, the Southern District of California in *Benton v. Ashcroft*, 2003 WL 21739087 at *6, stated there was "no bright line distinction between substantive and interpretative rules." In this circuit though it is clear from *Jean* that a drastic change in policy is considered rule making subject to the requirements of the APA and this new BOP policy is just that, a drastic change in agency policy. For the eight cases finding a violation of the APA, see *Mallory v. United States*, No. Civ. A. 03-10220-DPW, 2003 WL 1563764 (D. Mass. March 25, 2003); *Estes v. Federal Bureau of Prisons*, 2003 WL 21730541 at *8; *Tipton v. Federal Bureau of Prisons*, 262 F.Supp.2d 633 (D. Md. 2003); *Ferguson v. Ashcroft*, 248 F. Supp.2d 547 (M.D. La. 2003); *Howard v. Ashcroft*, 248 F.Supp.2d 518 (M.D. La. 2003); *Iacaboni v. United States*, 251 F.Supp.2d 1015 (D. Mass. 2003); *McDonald v. Federal Bureau of Prisons,* No. 1:03-CV-235 (N.D. Ga. Feb. 14, 2003); and *Monahan v. Winn*, 2003 WL 2194098 at *12..

## IV. CONSTITUTIONAL CLAIMS

### A. Due Process

Three separate guarantees serve as the basis for Plaintiff's claim that his right to due process of law was violated, specifically, the right to be sentenced based on accurate information, to have fair notice of changes in the laws affecting him and the right to a legitimate expectation of finality in his sentence. Each of Plaintiff's due process claims must be dealt with individually. First, Plaintiff contends his right to be sentenced based on accurate information was violated, as at the time Plaintiff was sentenced the BOP regularly transferred inmates to a CCC even when more than ten percent of the inmate's term of incarceration remained. Plaintiff points to *Cutler*, 241 F. Supp. 2d at 19, in support of his right to be sentenced based on accurate information, but fails to note that in *Cutler* the inmate was serving her entire sentence in a CCC based on an explicit recommendation of the sentencing court and the sentencing court held that the sentence would have been altered in part or all together had that court been aware of the new BOP policy. This rationale was followed in *Pearson v. United States*, 265 F. Supp. 2d 973 (E.D. Wis. 2003) and in *Byrd*, 252 F. Supp. 2d 293, where sentencing courts held that the due process rights of the inmate were violated by the new BOP policy because of the explicit sentencing recommendation.

No sentencing recommendation was ever entered in this case. In fact, this Court made no suggestion and had no expectation of where Plaintiff would be housed or when or if he would be transferred to a CCC. Plaintiff's sentence was entered without regard to the BOP transfer policy, either new or old, and thus was not based on any BOP transfer

policy information. Accordingly, no due process right to be sentenced based on accurate information was violated.[5]

The second due process violation specifically alleged by Plaintiff is that he has a right to have fair notice of changes in the law that affect him, and this new policy was promulgated in such a way that this notice was denied. Plaintiff bases his argument on the retroactive application of the new policy and the unforseeability of the development of such a policy. As noted above, Plaintiff does not fall within the group of persons to which this new policy was retroactively applied. Furthermore, a plain reading of § 3624 would have provided Plaintiff with a clear statement of the Congressionally mandated rule. While BOP procedure varied substantially from this provision, it was not completely unforseeable that at some point in time BOP would act in conformity therewith.

Lastly, Plaintiff contends his due process rights were violated as he has been denied the right to a legitimate, settled expectation of finality in his sentence. This argument is without merit as this Court lacks the authority or ability to designate anything more than the length of confinement. On September 4, 2002, when Plaintiff was sentenced to eighteen months in the custody of the BOP he was provided the finality he had a right to expect. The location where Plaintiff is housed and under what circumstances Plaintiff is incarcerated is within the complete discretion of the BOP. See § 3621 (giving the BOP

---

[5] In addition to the three cases factually distinguished from Plaintiff's where the inmates due process right was found to be violated by the new BOP policy, four other decisions have denied that there was a due process violation. See *Borgetti v. Bureau of Prisons*, No. 03 C 50034, 2003 WL 743936 (N.D. Ill. Feb. 14, 2003), *United States v. Kramer*, 2003 WL 1964489 at *4; *United States v. Pena*, No. 00-CR-170S-1, 2003 WL 21197024 (W.D. N.Y. May 16, 2003) and *United States v. Herron*, No. 03-3039-JAR, 02-40056-001-JAR, 2003 WL 272170 (D. Kan. Feb. 3, 2003).

complete discretion as to the place of confinement for those in their custody.) For these reasons, Plaintiff's claimed violations of his right to due process fail.

### B. Equal Protection

Under well-established equal protection jurisprudence, similarly situated individuals must be treated the same. If similarly situated individuals are treated differently, the individual challenging the classification, absent the implication of a suspect class, must be able to show the government was without a rational basis for the treatment. *See* ***City of Cleburne v. Cleburne Living Center***, 473 U.S. 432 (1985); ***Romer v. Evans***, 517 U.S. 620 (1996). Plaintiff does not implicate a suspect class. Rather, Plaintiff asserts that he is treated differently from those inmates participating in drug rehabilitation and intensive confinement programs (referred to as RDAP and Shock Incarceration, respectively). Pointing to the exception provided for these inmates that allows them to serve more than the final ten percent of their sentences in a CCC, Plaintiff claims that similarly situated persons, that is inmates of the BOP, are treated differently without a rational basis.

Upon examination of Plaintiff's claim in conjunction the Sentencing Guidelines, Plaintiff's equal protection claim must fail. When promulgated by the Sentencing Commission, the Sentencing Guidelines and the corresponding code sections were put forward to achieve uniformity, to meet the goals of deterrence, incapacitation, just punishment and rehabilitation, and to provide proportionality between the crime committed and the sentence received. *See* 18 U.S.C.A. CH.1, PT. A (West 2000). These very purposes highlight the intent to treat inmates within the penal system with the same objective in mind but individually and in differing manners as it is not possible to rehabilitate

every inmate in the same fashion. Specifically, considering the drug program Plaintiff contends receives differing treatment, it should be noted that to rehabilitate such offenders a longer period of controlled release into society, where the inmate faces the pressures of returning to drug use, is needed. Thus, BOP has created separate programs to serve the needs of drug addicted inmates. See § 3621 (authorizing drug treatment programs for addicted inmates). Considering the need and purpose, this differing treatment between Plaintiff and drug addicted inmates, seems to have at least a rational basis to the legitimate government purposes served by the penal system.

With regard to those inmates placed in the Shock Incarceration Program, the treatment received by those inmates and the treatment received by Plaintiff again appears to have at least a rational relationship to a legitimate government interest, justifying any disparities. Inmates participating in and completing the Intensive Confinement Center ("ICC") program are governed according to 18 U.S.C.A. § 4046 (West 2000), which provides for radically harsher treatment of these inmates deemed eligible for participation and who agree to participation. The ICC is designed to be a highly regimented, intensely harsh schedule similar to military boot-camp and is only available to inmates serving twelve to thirty month sentences. Inmates housed in an ICC are allowed a greater length of time in a CCC to monitor their success in responding to societal pressures based on the training received in the ICC. These are typically those less serious offenders in need of discipline, structure and counseling programs. This purpose of the penal system in providing another method for rehabilitation, deterrence and punishment is rationally related to the

classification drawn between Plaintiff and inmates in an ICC and thus does not violate his right to equal protection.

### C. Ex Post Facto

Defined as "after the fact," laws qualifying as ex post facto are those criminalizing behavior that was legal when preformed. BLACKS LAW DICTIONARY 520 (5TH ED. 1979). Bank fraud was illegal when committed by Plaintiff and remains so today. Therefore, the only possible ex post facto violation Plaintiff could allege is that the punishment which he received was increased after the fact against the constitutional clause which prohibits such an occurance. The fallacy of this argument, however, is that Plaintiff's punishment was not increased or altered by the new BOP policy, he has known since September 2002 his sentence was 18 months, rather, what was altered was the place of incarceration. Considering the same claim, the court in *United States v. Schild*, No. 00-40021-01, 03-3028-RDR, 2003 WL 260672 at *3 (D. Kan. Jan. 21, 2003) pointed out that,

> [d]efendant's length of sentence is not changed by the redesignation of his place of confinement; rather his conditions of confinement are changed, admittedly to defendant's significant disadvantage. But, this kind of change was possible prior to the modification in the Bureau's interpretation of law,....

Plaintiff may be unhappy with or disadvantaged by the BOP's changed decision concerning his place of confinement, but this change does not amount to a violation of the ex post facto clause of the Constitution.

Violations of the ex post facto clause have been found by the Supreme Court when changes in prison policy have resulted in returning an inmate already paroled to prison. See *Lynce v. Mathis*, 519 U.S. 443 (1997); *Weaver v. Graham* 450 U.S. 24 (1981). Key

14

to the *Lynce* case, according to the Supreme Court, was that the retroactively applied law affected the length of confinement for the inmate. In the present case though, Plaintiff's term of confinement has not varied at all in length, the variation is only in location as was the variation in the inmate's sentence in **United States v. Kramer** 2003 WL 1964489 at *5 where the court stated, "[t]he BOP's policy change, unlike the enactments at issue in **Weaver** and **Lynce**, has no effect on Kramer's length of confinement; rather it merely affects the conditions under which Kramer will be confined." Admittedly for those inmates currently located in a CCC and removed to prison by this new BOP policy, the retroactive application of this policy may rise to the level of an ex post facto violation. *See* **Titpton v. Federal Bureau of Prisons**, 262 F. Supp. 2d 633 (D. Md. 2003); **United States v. Serpa**, 251 F. Supp. 2d 988 (D. Mass. 2003); and **Ashkenazi v. Attorney General**, 246 F. Supp. 2d 1 (D. D.C. 2003). However, as applied to Plaintiff, the new BOP policy does not rise to the level of an ex post facto violation.[6]

## V. REMEDY

Plaintiff prays this Court to order the BOP to withdraw its order which denied Plaintiff a transfer to a CCC on or about August 15, 2003 and to order him placed in a CCC. The injunction Plaintiff seeks may only be granted if Plaintiff carries the burden of proving each of the four elements required in the standard for injunctive relief. Having determined that factors two, three and four were in Plaintiff's favor, the Court considered Plaintiff's statutory

---

[6] For additional case support that this new BOP policy affecting location or condition of confinement does not rise to the level of an ex post facto violation *see* **United States v. Pena**, 2003 WL 21197024 at *3 and **Benton v. Ashcroft** 2003 WL 21739087 at *7.

and constitutional claims finding the new BOP policy invalid for failure to follow APA notice and comment and thus that Plaintiff also shows a likelihood to succeed on the merits.

Even in light of Plaintiff's proof that an injunction is proper, this Court lacks the authority to order the BOP to act, as Plaintiff seeks in his motion. Upon review of § 3621 it is clear that the authority to designate a place or location of imprisonment is within the sole discretion of the BOP, the court may make a recommendation during sentencing but is without further jurisdiction. However, this Court is not without all ability to act. Following the actions of two other courts within the Eleventh Circuit, this Court enjoins the BOP from exercising its discretion on Plaintiff's place of incarceration based on the invalid BOP policy at issue. Plaintiff's place of incarceration should be determined without consideration the of invalid policy. See *Estes*, 2003 WL 21730541 at *8 and *McDonald*, No. 1:03-CV-235 at 18.

## VI. CONCLUSION

For the reasons set forth above, the Court finds that the BOP violated § 553 of the APA in adopting the policy at issue without complying with the required notice and comment procedure. Accordingly, it is **ORDERED** and **DECREED** that (1) Defendants shall reconsider the designation of the place of incarceration for Plaintiff and (2) that Plaintiff's reconsidered designation shall be made without consideration of the invalid policy, and instead shall be based entirely on pre-December 2002 criteria.

SO ORDERED, this 29 day of August, 2003.

*[signature]*

DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/has

ENTERED ON DOCKET
08-29, 20 03
Gregory J. Leonard, Clerk
*[signature]*
Deputy Clerk